UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TIMOTHY UPCHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01310-SEB-KMB |
| | ) | |
| INDIANA DEPARTMENT OF CORRECTION, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now before the Court is Defendants' Motion for Summary Judgment [Dkt. 89].

Plaintiff Timothy Upchurch, a longtime employee of Defendant Indiana Department of

Correction ("IDOC") at the Correctional Industrial Facility ("CIF") in Pendleton, Indiana,

brings this lawsuit against IDOC and Defendant Delana Gardner, in her official capacity

as Warden of the CIF, alleging that Defendants subjected him to unlawful discrimination

and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C.

§ 1983, respectively.  For the reasons detailed below, we GRANT Defendants' Motion for

Summary Judgment.

**Factual Background**[1]

---

[1] This is the second employment discrimination case filed by Mr. Upchurch over which the undersigned judge has presided.  The first case, Cause No. 1:19-cv-4644-SEB-MG, dealt with Mr. Upchurch's allegations of discriminatory and retaliatory employment actions occurring prior to January 28, 2022; this second case involves allegations arising after that date.  On February 7, 2024, the Court granted summary judgment in favor of IDOC in Mr. Upchurch's first employment discrimination case.  That decision was affirmed on appeal by the Seventh Circuit on July 25, 2025.

For approximately thirty years, Mr. Upchurch, a Black man, has worked in various positions within the CIF, which is operated by IDOC, an agency of the State of Indiana. During the period of Mr. Upchurch's employment relevant to this litigation, Wendy Knight acted as warden of CIF from November 2022 to December 31, 2023. Defendant Gardner has served as warden from the time of Warden Knight's departure to the present. Andrew Cole served as the Deputy Warden during the relevant time period.

**Applicable Employee Policies and Standard of Conduct**

Indiana's State Personnel Department has created a handbook to guide those employed by state departments and agencies. The handbook provides that state employers have a policy against harassment or discrimination due to race and color, among other protected classes, and that the State "does not tolerate, condone or allow any harassment or discrimination whether verbal, physical or environmental." Dkt. 90-3 at 18. The bottom of every job posting for state agency positions provides that the State "is an Equal Opportunity Employer and is committed to recruit, select, develop, and promote employees based on individual ability and job performance," regardless of protected characteristics such as race or color. *Id.* at 5.

Under IDOC's "Information and Standards of Conduct for Departmental Staff," IDOC staff have an affirmative duty to know and comply with IDOC policies and standards of conduct. As is relevant to this litigation, under IDOC's policies, "Dereliction/Neglect of Duty" includes, but is not limited to, "failure to take appropriate action on an act or condition deserving attention," and failure to "strictly adhere to the Standards of Conduct and any and all other standards …." *Id.* at 78.

2

Throughout the relevant time period, CIF had a policy in effect pursuant to which an employee was not eligible for a promotion within twelve months of receiving formal discipline, including suspensions and written reprimands in lieu of suspension. Dkt. 90-6 ¶¶ 13–14; Dkt. 90-7 ¶ 12. Similarly, employees were ineligible for promotion if their most recent evaluation had a rating of "doesn't meet" expectations in a particular category. Dkt. 90-6 ¶ 13; Dkt. 90-7 ¶ 12. Warden Knight implemented a protocol for promotions at CIF requiring a candidate to complete a promotion checklist before any promotion was finalized. Dkt. 90-6 ¶ 15.

**Plaintiff's February 2021 Discipline**

On February 3, 2021, Mr. Upchurch received a ten-day suspension for possessing and using chewing tobacco found in a corridor at CIF. Dkt. 90-1 ¶ 10. This discipline was addressed in Mr. Upchurch's first lawsuit, in which he maintained that the incident was entirely contrived or concocted. In discussing this incident, the Seventh Circuit found that Mr. Upchurch had "failed to meet [the] evidentiary bar" required to demonstrate that the tobacco discipline was pretextual. *Upchurch v. Indiana*, 146 F.4th 579, 588 (7th Cir. 2025).

**Plaintiff's September 2022 Discipline**

On September 6, 2022, Mr. Upchurch was working on the I-Bracket near cell IWO-2, where offender Steven Almeida was housed. Dkt. 90-4 ¶ 28. On that day, Mr. Almeida twice attempted to kick through the cuff port (a small opening in the cell that is used to handcuff an offender) and squeeze his body through the opening. Dkt. 90-1 ¶ 12;

3

Dkt. 90-5 ¶ 18.  At one point, Mr. Almeida had maneuvered half of his body out of the cuff port.  As the correctional officer assigned to I-Bracket during the shift, it was Mr. Upchurch's responsibility to respond to Mr. Almeida's escalating conduct.  Dkt. 90-5 ¶ 19.  Mr. Upchurch responded by ordering Mr. Almeida to "get back in the cuff port." Dkt. 90-2 at 67.  Mr. Upchurch also reported to his supervisor that Mr. Almeida was kicking his cuff port, which was rusted, and requested a cell extraction to move Mr. Almeida to another cell that did not have a rusted cuff port.  *Id.* at 76–79.

Other correctional staff responded to the incident, including Unit Team Manager Alison Yancey, Lieutenant Harold Disney, and Sergeant Kaffenberger and took action to attempt to calm Mr. Almeida.  *Id.* at 68.  Major Jerry Gilley arrived amid Mr. Almeida's second attempt to kick through the cuff port.  Major Gilley believed that Mr. Upchurch was not adequately responding to Mr. Almeida's attempt to escape and directed Mr. Upchurch to use pepper spray and shut off the water to gain his compliance.  Dkt. 90-5 ¶¶ 20, 22.  Ultimately, Major Gilley and other supervisors entered Mr. Almeida's cell, wrestled with him, and extracted him to another cell.  Dkt. 90-2 at 76–79.

As the shift supervisor of the I-Bracket, Captain Corey Valdez was responsible for assessing discipline and misconduct during the shift.  Dkt. 90-4 ¶ 33.  After receiving reports from other correctional officers that Mr. Upchurch did not respond promptly or adequately to Mr. Almeida's conduct, Captain Valdez reviewed surveillance video of the incident.  *Id.* ¶¶ 31, 34.  Based on his review of the surveillance video, Captain Valdez determined that Mr. Upchurch had failed to promptly respond and concluded that Mr.

Upchurch's inaction constituted a dereliction/neglect of duty, in violation of the standard of conduct. *Id.* ¶ 34.

Captain Valdez also determined that Mr. Upchurch had failed to complete a conduct report regarding the incident with Mr. Almeida. As the correctional officer assigned to the I-Bracket, Mr. Upchurch was responsible for completing a conduct report for any incident that occurred during his shift, including when force is used against an offender. When asked about his failure to prepare a report, Mr. Upchurch responded that there was no need to do so because Mr. Almeida was a seriously mentally ill offender and Mr. Upchurch had been told by a doctor that such offenders do not receive discipline. According to Captain Valdez, however, conduct reports are still required for seriously mentally ill offenders because such an offender may still receive discipline if a mental health professional determines that discipline is appropriate after reviewing the conduct report.

After reviewing the surveillance video and speaking with Mr. Upchurch, Captain Valdez submitted a request for discipline to Deputy Warden Cole based on Mr. Upchurch's inaction during the incident and subsequent failure to complete a conduct report. Dkt. 90-4 ¶¶ 37–38; Dkt. 90-14 at 2. On September 28, 2022, Mr. Upchurch received a written reprimand in lieu of a ten-day suspension, which disqualified him from promotion for more than a year. Dkt. 90-4 ¶¶ 37–38; Dkt. 90-14 at 1. Deputy Warden Cole met with Mr. Upchurch to discuss the discipline and cited Mr. Upchurch's failure to adequately respond to Mr. Almeida's escape attempts, Mr. Upchurch's need to be given direction on what to do when he should have known how to respond, and Mr. Upchurch's

5

failure to complete a conduct report as the reasons for the discipline.  Dkt. 90-14 at 1–2. According to Mr. Upchurch, CIF has no practice or policy regarding which individual is responsible for preparing the conduct report, and, although Major Gilley took charge of handling the situation with Mr. Almeida, neither he nor any of the other responding supervisors, including the shift supervisor, Lieutenant Disney, made a conduct report nor directed Mr. Upchurch to do so.  Dkt. 90-2 at 75–80.

**Plaintiff's Performance Evaluations**

Mr. Upchurch received "Successful" ratings on his 2021 performance evaluation in all categories except "Meeting Basic Work Expectations," where he received an "Unsuccessful" rating based on two disciplinary issues, including his ten-day suspension for the tobacco incident.  Dkt. 90-15.  In his 2022 performance appraisal, Mr. Upchurch was rated "Unsuccessful" in the categories of "Meeting Basic Work Expectations," "Report Writing," and "Critical Thinking," based largely on Mr. Upchurch's handling of the incident with Mr. Almeida.  Dkt. 90-16.  In 2023, Mr. Upchurch improved significantly, receiving all "Successful" ratings on his performance appraisal, including an "Exceeds" rating in "Meeting Basic Work Expectations.  Dkt. 90-17.

**Plaintiff's Applications for Promotion after January 2022**

IDOC records indicate that from January 28, 2022 through January 2025, Mr. Upchurch submitted twenty-two applications for promotions or other positions, the majority of which were correctional positions in the CIF.[2]  Dkt. 90-3 at 4.  The record

---

[2] Mr. Upchurch testified by deposition that he submitted additional applications not reflected in IDOC's records but that he could not remember what those positions were.  In response to

includes a spreadsheet compiled by IDOC showing the positions, the date applied, the

hiring manager, the facility at which the position was located, the candidate chosen, and

the reason Mr. Upchurch was not selected, if applicable.  Dkt. 90-3 at 4.

CIF's "hiring manager" does not actually have the ultimate authority to promote or

hire.  Rather, for promotions at CIF during the relevant time period, a supervisor referred

to as the "hiring manager" was tasked with assembling an interview committee, selecting

the candidates to be interviewed for a position, and, at times, participating in the

interview.  Dkt. 90-6 at ¶¶ 8–9.  After the interviews for a position were completed, the

hiring manager would recommend a candidate for promotion to the warden of CIF, which

recommendation was itself based on the recommendation or preference of the entire

interviewing committee.  *Id.* ¶ 8.  The warden had the ultimate authority to approve or

reject the proposed candidate.  *Id.* ¶ 9.

Although the interview committee, hiring manager, and warden were free to

consider a candidate's experience in determining who should be recommended and

ultimately selected for an open position at CIF, experience was not the only factor that

was considered.  Other factors considered when evaluating candidates for a position or

promotion at CIF included job performance, disciplinary record, attitude and effort,

---

Defendant's summary judgment motion, Mr. Upchurch argues that there are several other promotions that he was denied which are referenced in his Amended Complaint, but which Defendants do not address in their summary judgment motion.  However, the allegations in Plaintiff's unverified Amended Complaint are not evidence, and Plaintiff has presented no evidence regarding these other positions in opposition to Defendants' summary judgment motion.  Accordingly, we address only the 22 applications included in IDOC's records.

working relationships with others in the facility, recommendations from supervisors or coworkers, if any, and interview performance. *Id.* ¶¶ 10–11.

Out of the twenty-two applications Mr. Upchurch submitted during the time period relevant to this litigation, he received two of the promotions he sought. Specifically, Mr. Upchurch was promoted to correctional sergeant in April 2024 and promoted to correctional lieutenant in January 2025. Dkt. 90-2 at 56, 62. Of the remaining twenty applications, one application is duplicative because Mr. Upchurch applied for the same position twice, and Mr. Upchurch has testified that he has no reason to believe that unlawful race discrimination or retaliation was the reason he did not receive a promotion in five other cases. Dkt. Dkt. 90-2 at 30–33; Dkt. 90-3 at 4. This leaves fourteen CIF correctional positions for which Mr. Upchurch applied and believes that he did not receive the position either on account of his race or his previous complaints about discrimination. Dkt. 90-2 at 33.

Mr. Upchurch had received formal discipline within twelve months of his application for five of the remaining fourteen positions. The January 29, 2022 correctional lieutenant position was within twelve months of Mr. Upchurch's February 2021 formal discipline for tobacco possession and use. Dkt. 90-13 at 1. Mr. Upchurch's applications for the correctional sergeant positions dated January 18, 2023, April 4, 2023, and July 25, 2023, as well as his May 11, 2023 application for correctional sergeant were each within twelve months of his September 2022 formal discipline related to his dealings with Mr. Almeida. Dkt. 90-14 at 1. According to Defendants, Mr. Upchurch

was automatically removed from consideration for these promotions because of CIF's policy prohibiting promotion within twelve months of formal discipline.

In two other instances, IDOC did not fill the positions for which Mr. Upchurch applied.  Specifically, IDOC never filled the sergeant position for which Mr. Upchurch applied on September 12, 2022, and did not initially fill the lieutenant position for which Mr. Upchurch applied on December 12, 2024.  IDOC reposted the lieutenant position approximately one month later and selected Mr. Upchurch for the promotion.

The facts related to the remaining positions for which Mr. Upchurch was not selected are as follows:[3]

- February 18, 2022 Application for Sergeant:  According to Defendants, Mr. Upchurch was not selected for this position because he had been performing below expectations and did not have the knowledge, skills, or abilities required for the position.  The hiring manager, Captain Coats, and the interview committee instead recommended Austin Crosley-McCartney for the position.  In line with that recommendation, Warden Knight ultimately selected Mr. Crosley-McCartney.

- April 9, 2022 and June 7, 2022 Applications for Lieutenant:  Emmett Scott was selected for this position and was determined to be a better candidate that Mr. Upchurch because Mr. Scott was a sergeant at the time, so it was only a one-step promotion for him, whereas Mr. Upchurch was then a correctional officer, so it

---

[3] It is not clear from the record the race of each of the individuals selected for these positions. Viewing the evidence in the light most favorable to Plaintiff, we assume that each of the individuals chosen over him is outside his protected class.

would have required a two-step promotion for him, which was rare. Additionally, the hiring manager, Major Gilley, determined that Mr. Scott had more recent experience in a leadership role than Mr. Upchurch, and had performed well as a sergeant and in his interview. Based on these factors, Major Gilley recommended Mr. Scott for the promotion, which recommendation was approved by Warden Knight.

- May 20, 2022 Application for Sergeant: The hiring manager, Lester Coats, and the interview committee recommended Stephen Roberts, for this position, believing him to be a stronger candidate than the other applicants, including Mr. Upchurch. Warden Knight approved this recommendation and promoted Mr. Roberts.

- June 7, 2022 Application for Captain: Corey Valdez was selected for this promotion over Mr. Upchurch. According to Major Gilley, the hiring manager, Mr. Valdez was selected in part because of his previous experience as a lieutenant at the Texas Department of Correctional Facility. In that role, Mr. Valdez had managed a large staff and worked with offenders on death row and in administrative segregation, meaning that he had experience overseeing staff and training them to handle serious offenders, who could be violent and unpredictable.

- October 25, 2023 Application for Sergeant: The hiring manager was Captain Valdez and Blade Looney was selected for the position. Dkt. 90-3 at 4. According to Defendants, Mr. Looney was determined to be the best candidate based on his recent job performance and strong interview. Dkt. 90-4 ¶ 15. Captain Valdez chose not to interview Mr. Upchurch because his most recent performance

evaluation (for the year 2022) showed that he had received an unsuccessful rating on one of the categories measuring his job performance. *Id.* ¶ 14.

- January 12, 2024 Applications for Sergeant and Lieutenant: Gregory Krathwohl was selected for the sergeant position and Justin Renick was selected for the lieutenant position. Dkt. 90-3 at 4. Captain Valdez, the hiring manager, testified that Mr. Krathwohl and Mr. Renick were each recommended for and ultimately selected for the respective promotions based on their recent strong job performance and interviews. Dkt. 90-4 ¶ 19. Because the 2023 evaluations were not yet available at the time, Captain Valdez relied on the candidates' 2022 performance evaluations in deciding who to interview and both Mr. Krathwohl's and Mr. Renick's 2022 evaluations were more positive than Mr. Upchurch's. *Id.* ¶ 17.

Following the January 2024 selection process, Captain Valdez encouraged Mr. Upchurch to continue to apply for promotions because he believed that Mr. Upchurch had been demonstrating quality job performance. *Id.* ¶ 20. Mr. Upchurch's 2023 performance appraisal, which became available in March 2024, reflected improvement from his 2022 review. *Id.* ¶ 21. As discussed above, Mr. Upchurch was promoted shortly thereafter, in April 2024, and again in January 2025.

Mr. Upchurch believes "without question" that, based on his length of tenure, "job knowledge," "policy habits," and prior experience as a supervisor, he was a better candidate than each of the employees selected for the promotions that he did not receive. Dkt. 90-2 at 44. Mr. Upchurch also believes that the warden and his other supervisors

11

would state that his policy knowledge and professionalism are "superior" to other candidates.  *Id.* at 46–47, 49–50.

**Plaintiff's Co-Workers' Promotions**

In August 2022, another CIF correctional officer, Coby Richardson, was promoted to the position of sergeant.  Dkt. 90-6 ¶ 18.  Although Mr. Richardson's most recent discipline had been on April 9, 2021, more than one year prior to his promotion, because he had received a "below expectations" on his most recent evaluation, he should have been ineligible for promotion under CIF's policies.  *Id.*

At some point after his promotion, Mr. Richardson "came back to [Mr. Upchurch's] area and he expressed to [Mr. Upchurch] that he was promoted to sergeant and then he expressed to [Mr. Upchurch] that he wasn't supposed to tell anybody because they [CIF] didn't want anybody to know that he had discipline in his packet, record." Dkt. 90-2 at 90.  Mr. Upchurch testified that, while Mr. Richardson did not share the underlying nature of the discipline or when he had received it, he had stated, "I'm still not clear of my discipline."  *Id.* at 91.  Although the timing is not entirely clear from the record, at some point after this conversation with Mr. Richardson, Mr. Upchurch verbally complained that Mr. Richardson had been promoted to sergeant despite having discipline on his record within one year.  Dkt. 90-2 at 88–94.

Warden Knight had been on medical leave at the time Mr. Richardson was promoted, but when she returned from leave and learned that he had been promoted in violation of the protocols she had implemented to ensure that candidates with disciplinary issues or poor performance ratings be ineligible for promotion, (Dkt. 90-6 ¶¶ 15–16, 19),

12

on September 8, 2022, Deputy Warden Cole rescinded Mr. Richardson's promotion and demoted him back to the rank of correctional officer. *Id.* ¶ 20. It was discovered that another CIF employee, Matthew Perry, had likewise been promoted during this period without the proper procedures being followed; thus, he was demoted as well. Dkt. 114-3. On September 12, 2022, Warden Knight disciplined Lester Coats and Jerry Gilley for their oversight in failing to conduct the promotion checklist before promoting Mr. Richardson and Mr. Perry. *Id.* ¶ 21; Dkt. 90-8; Dkt. 90-9.

A few months later, in January 2023, Mr. Richardson was again promoted to sergeant. By that point, Mr. Richardson had been discipline-free for over eighteen months, and, according to Warden Knight, had substantially improved his performance from prior years. Dkt. 90-6 ¶ 23. Mr. Richardson's performance appraisals for 2020, 2021, and 2022 are not in his personnel file to confirm Warden Knight's recollection of Mr. Richardson's performance in those years, however. In 2024, Mr. Richardson was promoted from Sergeant to the position of Correctional Intelligence Officer. Dkt. 90-26 at 2.

**Plaintiff's Internal Complaints**

At some point in 2022 or 2023, Mr. Upchurch approached Carol Roberts, who was then a Diversity, Inclusion and Belonging Representative for CIF, as she walked through his jobsite at CIF to discuss issues he had "pertaining to the case." Dkt. 90-2 at 9, 11. Specifically, he asked Ms. Roberts why he was unable to be interviewed for promotions due to his discipline when Mr. Richardson had been promoted despite also having discipline. *Id.* at 88–89. Mr. Upchurch also requested contact information for a person

who did not work at CIF with whom he could discuss his concerns.  Dkt. 90-10 ¶ 4.  Ms. Roberts provided Mr. Upchurch the contact information for Victoria Taylor-Wilcher, the Director of Equity and Inclusion within the DOC, who assisted employees at CIF as well as other correctional facilities.  *Id.* ¶¶ 6–7.  Ms. Roberts took no other action in response to Mr. Upchurch's queries because she had no authority to investigate claims of discrimination.  *Id.* ¶ 9.

Mr. Upchurch contacted Ms. Taylor-Wilcher and reported that he was being treated unfairly at CIF based on the discipline he had received for the incident with Mr. Almeida and based on his understanding that Mr. Richardson had been promoted within twelve months of having received discipline.  Dkt. 30-11 ¶ 6; Dkt. 90-18 at 4.  According to Ms. Taylor-Wilcher, Mr. Upchurch's main objective in contacting her was to request assistance in having his disciplinary record cleared.  However, Ms. Taylor-Wilcher had no authority to clear an employee's disciplinary record, nor did she have authority to investigate claims of discrimination.  Dkt. 90-11 ¶¶ 7–9.  Mr. Upchurch told Mr. Taylor-Wilcher that he had retained an attorney and has previously discussed his concerns with a representative of the Indiana State Personnel Department; as a result, she took no further action regarding Mr. Upchurch's complaints because he was already pursuing the matter through the legal system.  *Id.* ¶ 10.

**Plaintiff's EEOC Charges**

Since January 28, 2022, Mr. Upchurch has submitted four separate charges of discrimination with the EEOC, plus two amendments.[4]  Dkt. 90-12 ¶ 7.  According to Defendants, either counsel for IDOC or a representative from the State Personnel Department reviewed the allegations in each of Mr. Upchurch's submissions, investigated any new allegations made, and assisted in drafting the position statement on behalf of IDOC.  *Id.* ¶ 7.  After their investigations, IDOC and/or the State Personnel Department determined that Mr. Upchurch's allegations of discrimination and retaliation were unsubstantiated.  *Id.* ¶ 9.  Mr. Upchurch denies that IDOC conducted any investigation .

**The Instant Lawsuit**

On July 26, 2023, Mr. Upchurch filed his original complaint in this lawsuit against Defendants State of Indiana, Indiana Department of Correction, and Indiana State Personnel Department, as well as Defendants Wendy Knight, Andrew Cole, and Delana Gardner, in their official and individual capacities, alleging that Defendants subjected him to unlawful discrimination and retaliation in violation of Title VII, § 1981, and § 1983.  In October 2024, this case was consolidated with Case No. 1:24-cv-1376-JMS-MKK, and the Court ordered Plaintiff to file an amended complaint to set forth all allegations at issue in this case, which Plaintiff did on January 2, 2025.

Following the Court's August 12, 2025 Order on Defendants' Second Motion for Judgment on the Pleadings, the claims remaining for decision in this case are Mr. Upchurch's official capacity § 1983 claim against Warden Gardner and his Title VII

---

[4] In total, Mr. Upchurch has submitted eight charges of discrimination to the EEOC since May 8, 2019.  Dkt. 90-12 ¶ 6.

claims against IDOC.  Defendants' summary judgment motion on these remaining claims is now fully briefed and ripe for ruling.

**Legal Analysis**

### I.      Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.      Discussion

#### A. Failure to Disclose Legal Claims in Bankruptcy Court

We turn first to address Defendants' argument that Mr. Upchurch's claims fail because he did not disclose them in his bankruptcy proceedings.  In 2021, Mr. Upchurch filed a voluntary petition for Chapter 13 bankruptcy, which remains pending.  Mr. Upchurch disclosed his prior suit against the State of Indiana, but, at the time the instant motion was filed, he had not amended his schedules to include the current suit in his bankruptcy proceedings.  In their opening brief in support of summary judgment, Defendants argued that, because Mr. Upchurch did not timely list his claim against IDOC

16

or any other defendant originally named in this action, he has no standing to pursue this case and the principles of judicial estoppel bar the lawsuit.  In response, Mr. Upchurch first argued that he was not required to notify the bankruptcy court of the current lawsuit because it "is a continuation of his claims against the State," (Dkt. 115 at 28), but Mr. Upchurch ultimately amended his schedules to list this lawsuit in his bankruptcy on December 8, 2025, approximately three-and-a-half months after Defendants first raised the issue.

It is clear that, because Mr. Upchurch's claims in this lawsuit arose after his bankruptcy proceedings commenced and before it concluded, they are property of the bankruptcy estate.  *See* 11 U.S.C. 1306(a)(1) ("Property of the [Chapter 13 bankruptcy] estate includes … all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted …."); *Rainey v. United Parcel Serv., Inc.*, 466 Fed. App'x 543, 544 (7th Cir. 2012) ("A Chapter 13 estate encompasses all property, including legal claims, acquired after the petition is filed and before the case is closed.").  Under Section 541 of the Bankruptcy Code, debtors are required to schedule as assets "all legal or equitable interests of the debtor in property as of the commencement of the [Chapter 13 bankruptcy] case," (11 U.S.C. § 541(a)(1)), and then "[d]ebtors have a continuing duty to schedule newly acquired assets while the bankruptcy case is open." *Rainey*, 466 Fed. App'x at 544.  Although Mr. Upchurch neglected his duty to report this lawsuit for more

17

than years after it was filed, he has now fulfilled his duty to inform the bankruptcy court by amending his schedules to list this action.[5]

A Chapter 13 debtor "retains possession of the bankruptcy estate's property and 'has concurrent standing with the bankruptcy trustee to pursue claims on behalf of the estate.'" *Thomas v. Indiana Oxygen Co.*, 32 F. Supp. 3d 983, 987–88 (S.D. Ind. 2014) (quoting *Tucker v. Closure Sys. Int'l*, No. 1:10-cv-1476-RLY-TAB, 2011 WL 4479112, at *2 (S.D. Ind. Sept. 27, 2011)).  Mr. Upchurch therefore has standing to proceed in this lawsuit on behalf of the bankruptcy estate.  *See Rainey*, 466 Fed. App'x at 544 ("[A] Chapter 13 debtor can inform the trustee of previously undisclosed legal claims, and unless the trustee elects to abandon that property, the debtor may litigate the claims on behalf of the estate and for the benefit of the creditors without court approval."); *Thomas*, 32 F. Supp. 3d at 988 (holding that once the Chapter 13 debtor had amended his schedules to include the cause of action, he had standing to pursue claims on behalf of the estate).

Defendants argue that, even if Mr. Upchurch has standing to pursue these claims on behalf of the estate, he should be judicially estopped from doing so, having failed to timely disclose them in the bankruptcy court.  Mr. Upchurch testified in his deposition that, as a result of Defendants' conduct, he lost back pay, benefits, and compensatory damages in the amount of $50,000 per year as well as lost future earnings of $20,000 per year for fifteen years, and that he is seeking, in total, $2.4 million in damages.

---

[5] We can, and do, take judicial notice of the proceedings in the bankruptcy court.  *See In re Consol. Indus. Corp.*, 397 F.3d 524, 527 (7th Cir. 2005).

Defendants contend that Mr. Upchurch's failure to schedule these claims as an asset and his belief that the claim is worth hundreds of thousands (if not millions) of dollars, "are two fundamentally inconsistent positions[]" and "[a]s such, judicial estoppel should apply to prevent [Mr.] Upchurch from collecting an asset not disclosed to the bankruptcy court." Dkt. 116 at 14.

Judicial estoppel is an equitable doctrine that may be invoked by the court at its discretion. *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006); *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire*, 532 U.S. at 749 (quotation marks and citation omitted). The purpose of the doctrine is "to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories," *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992), and it can be used, as Defendants seek to use it here, to estop the plaintiff from pursuing a claim entirely. *See Matthews v. Potter*, 316 Fed. App'x 518, 522-23 (7th Cir. 2009). "The doctrine of judicial estoppel is often applied to a debtor's cause of action when the debtor conceals a legal claim and denies owning the asset in bankruptcy, but may be inappropriate when the party's nondisclosure was based on inadvertence or mistake." *Thomas*, 32 F. Supp. 3d at 989 (citing *Matthews*, 316 Fed. App'x at 522; *New Hampshire*, 532 U.S. at 753; *Williams v. Hainje*, 375 Fed. App'x 625, 628 (7th Cir. 2010)) (citation modified).

We do not take lightly Mr. Upchurch's failure to disclose this action to the bankruptcy court for nearly two and a half years, including waiting nearly three and a half

19

months after Defendants raised the issue in their summary judgment briefing before alerting the bankruptcy court to these claims. *See Thomas*, 32 F. Supp. 3d at 992 (recognizing "the vital importance of full disclosure of legal claims to bankruptcy courts"). However, unlike the typical case in which judicial estoppel is applied based on a failure to disclose a legal claim in bankruptcy court, here Mr. Upchurch's bankruptcy case remains open, he has cured the nondisclosure, and he has not been shown to have received a discharge of his debts or other substantial gain from his failure to disclose this lawsuit. Additionally, we have not been informed that the trustee has abandoned the property such that Mr. Upchurch could bring the claim only for his personal benefit; rather, he must proceed on behalf of the bankruptcy estate. Under these circumstances, preventing Mr. Upchurch from bringing his claims would "undermine the interests of his creditors." *Rainey*, 466 Fed. App'x at 545. While it is not entirely clear on the record before us whether Mr. Upchurch's failure to disclose was inadvertent or purposeful, there is at least "no evidence that [he] intentionally manipulated the Bankruptcy Court or this Court by explicitly lying on his Petition or any other court document." *Thomas*, 32 F. Supp. 3d at 991. Based on the reasons set forth above, we will not apply judicial estoppel to bar Mr. Upchurch's employment discrimination claims. Mr. Upchurch is allowed to proceed with these claims acting on behalf of the bankruptcy estate.

### B. Title VII Claims

In this lawsuit, Mr. Upchurch claims that his 2021 and 2022 discipline and failures thereafter to receive several promotions at CIF for which he applied were the result of discriminatory and retaliatory animus in violation of Title VII. An analysis of these

claims invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that, regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

Here, Mr. Upchurch's opposition to IDOC's summary judgment motion as to the Title VII claims is based on his contention that, viewing the evidence holistically, a reasonable fact finder could conclude that the discipline he received in 2021 and 2022, his poor performance reviews those same years, and his failure thereafter to receive a promotion until April 2024 was all due to his race and in retaliation for his having complained of discrimination.  We shall follow his lead in structuring our analysis of his Title VII claims and consider only whether the evidence would permit a reasonable fact finder to conclude that Mr. Upchurch's treatment was caused by his race and/or his protected activity.  *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (suggesting that the court need not address the *McDonnell Douglas*

framework when the plaintiff does not utilize it in response to a summary judgment motion).

There is little dispute between the parties regarding the facts and timeline relevant to Mr. Upchurch's claims; rather, their dispute centers around the reasonable inferences emanating from the undisputed facts and timeline. Mr. Upchurch argues that the evidence, when viewed as a whole, establishes that he received positive performance reviews prior to April 2018, when he first complained of discrimination to Warden Knight and Deputy Warden Cole, and then, after he complained, he began receiving discriminatory and/or retaliatory discipline and poor performance reviews, which were used as a pretext for denying him promotions from 2021 through 2023. Mr. Upchurch asserts that this pattern persisted up until Warden Knight and Deputy Warden Cole left IDOC at the end of 2023, at which point Mr. Upchurch returned to receiving satisfactory performance reviews and was promoted twice in quick succession, in April 2024 and January 2025, respectively. Mr. Upchurch contends that, viewing the circumstances surrounding his September 2022 discipline, the promotion of two similarly situated White comparators in violation of IDOC's policies, IDOC's failure to investigate his complaints of discrimination, and evidence of his superior experience and qualifications, a reasonable jury could conclude that his failure to receive any promotion for which he applied between January 2022 and April 2024 was the result of unlawful discriminatory and/or retaliatory animus.

Defendants rejoin that Mr. Upchurch has failed to identify specific, admissible evidence from which a reasonable factfinder could determine that his race or protected

22

activity caused Defendants to discipline him or fail to promote him. Without evidence to call into question the legitimacy of the discipline and poor performance reviews he received through 2023, Defendants argue that the undisputed facts and timeline support the rather unremarkable conclusion that when Mr. Upchurch performed poorly, he was not selected for promotion, but once his performance improved and he remained discipline-free, he was promoted shortly thereafter.

A cornerstone of Mr. Upchurch's argument in opposition to summary judgment is that the discipline he received, which rendered him ineligible for promotion for much of the time relevant to this litigation, was discriminatory and/or retaliatory. Insofar as Mr. Upchurch argues that his February 3, 2021 discipline for tobacco possession was discriminatory and/or retaliatory, that argument is not well-taken. Those same arguments were raised and rejected by this Court in Mr. Upchurch's first lawsuit, which decision was affirmed by the Seventh Circuit on appeal. Mr. Upchurch cites no new evidence in this litigation that brings our prior analysis into doubt. Accordingly, pursuant to IDOC's policy, Mr. Upchurch was rendered ineligible for promotion based on that discipline until February 2022.

Mr. Upchurch has also failed to adduce evidence sufficient to raise an inference that his September 2022 discipline was motivated by discriminatory or retaliatory animus. On September 28, 2022, Deputy Warden Cole issued Mr. Upchurch a written reprimand in lieu of a ten-day suspension because he determined, based on a recommendation from Captain Valdez, that Mr. Upchurch had failed both to adequately

23

respond when an offender attempted to escape his cell and to complete a conduct report following the incident.

Mr. Upchurch claims that a reasonable jury could find that this discipline was the result of discrimination and/or retaliation because, contrary to Defendants' contention, he "did not fail to respond properly and did not 'do nothing.'" Dkt. 115 at 13. Rather, Mr. Upchurch argues, the evidence shows that the day before the incident for which he was disciplined, he had reported that the cuff port in the offender's cell was rusted and recommended that the offender be transported to a different cell. However, Mr. Upchurch's actions the day before the escape attempt have limited relevance because he was not disciplined based on any action (or inaction) on that day but instead for his failure to act promptly in response to the offender's attempt to escape through the cuff port and his failure to complete a report after the incident.

Although Mr. Upchurch disagrees with Defendants' characterization of his response to the escape attempt as "do[ing] nothing," his account of the incident does not differ in material ways from Defendants'. Mr. Upchurch does not dispute that, during the escape attempt, although he did call a lieutenant to report that the offender continued to push the cuff port open, Mr. Upchurch's minimal response was only to verbally direct the offender to get back in the cuff port, even after the offender had gotten "half of his body out of the cuff port." Dkt. 90-2 at 67-68. At that point, other officers and a unit team manager reported to the offender's cell. *Id.* Mr. Upchurch testified that he observed as Major Gilley approached the cuff port and engaged physically with the offender, but Mr. Upchurch did not physically engage with the offender until Major Gilley directed him to

24

spray the offender with pepper spray and Mr. Upchurch complied with that directive as best he could in the confined space. *Id.* Thus, Mr. Upchurch's testimony confirming that he did not attempt to physically prevent the offender from escaping until directed to do so by his supervisor aligns with the reasons given for his discipline, to wit, that he waited to be directed what to do rather than acting promptly on his own accord to control the situation.

Mr. Upchurch also argues that it was discriminatory for him, the only Black correctional officer present, to have been disciplined for failing to write a conduct report following the incident, when those actually "responsible for the situation," including Major Gilley and Lieutenant Disney, who are both White, were not similarly disciplined for their respective failures to write a report. Dkt. 115 at 14. Mr. Upchurch does not dispute that, pursuant to IDOC policy, a conduct report must be completed by IDOC staff in the event of a use of force, including the use of pepper spray and physical engagement with an offender. Despite acknowledging this policy, Mr. Upchurch testified that he believed that no report was required in this instance because the offender suffered from a serious mental illness, and Mr. Upchurch had been told by a doctor contracted with IDOC's medical provider that such offenders do not receive discipline. Mr. Upchurch contends that, even assuming a conduct report was still required, Major Gilley or Lieutenant Disney should have completed it because Major Gilley had taken responsibility for the situation and Lieutenant Disney was the shift supervisor.

According to Deputy Warden Cole, Mr. Upchurch was the correctional officer assigned to the I-Bracket on the date of the incident, and, as the officer assigned to the

25

area, it was his responsibility to complete the conduct report.  Deputy Warden Cole testified that the other individuals involved, including Major Gilley and Lieutenant Disney, were not responsible because they were supervisors of larger areas.  Dkt. 90-1 ¶ 24.  Additionally, Deputy Warden Cole testified that Mr. Upchurch's belief that conduct reports are not required for offenders suffering from serious mental illness is inaccurate.  Within IDOC, conduct reports are required regardless of an offender's status as a seriously mentally ill offender because a conduct report is not itself discipline but is instead reviewed by a mental health professional to determine whether discipline is appropriate, considering the offender's mental illness.  *Id.* ¶¶ 26–27.

Mr. Upchurch clearly disagrees with the discipline he received, arguing that Major Gilley was the person who should have been disciplined for escalating the situation and choosing to use force on a mentally ill offender.  He further believes that it should have been one of his supervisors who completed the conduct report.  But as we have often observed, the Court does not "sit as a super-personnel department that reexamines an entity's business decisions in cases where discrimination [and retaliation are] alleged." *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993) (citation and internal quotation marks omitted). "Title VII prohibits discriminatory [or retaliatory] employment actions, not hasty or ill-considered ones." *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 564 (7th Cir. 1998).  To survive summary judgment, Mr. Upchurch must show not merely that a reasonable jury could find that IDOC incorrectly or unwisely disciplined him but that the decisionmakers' explanations for his discipline were a pretext to cover up for a discriminatory or retaliatory motive.  *See Galvan v. Indiana*, 117 F.4th

935, 939 (7th Cir. 2024) ("The focus is not on the wisdom of the decision, but on its genuineness."). Here, Mr. Upchurch has failed to present sufficient evidence to cast doubt on the veracity of Defendants' proffered reason for the discipline or to connect that discipline to his race or protected activity.[6]

Having found that Mr. Upchurch has failed to identify a genuine issue of material fact regarding the legitimacy of the discipline he received, we turn next to address Mr. Upchurch's contention that IDOC inconsistently applied its policy that employees were ineligible for promotion within one year of having received discipline or an unsuccessful rating on a performance review. An employer's violation of its own policies can support an inference that an employer's stated reason was a pretext for intentional discrimination or retaliation. *See Murphy v. Caterpillar Inc.*, 140 F.4th 900, 915 (7th Cir. 2025).

Defendants concede that, in August 2022, two correctional officers, to wit, Mr. Richardson and Mr. Perry, were improperly promoted within one year of having received unsuccessful ratings on their 2021 performance reviews.[7] However, the evidence is

---

[6] Mr. Upchurch makes much of the fact that the video recording of the incident was destroyed prior to this litigation, arguing that this fact alone justifies denial of Defendants' summary judgment motion and the entry of a default judgment against them. However, the party alleging that evidence was destroyed in bad faith has the burden of proving that the evidence was "destroyed for the purpose of hiding adverse information." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008) (citation modified). "[S]imply failing to preserve surveillance footage does not equal the bad faith destruction of evidence." *Garcia v. Lowe's Home Ctrs., LLC*, No. 3:22-CV-928-CCB, 2024 WL 4723097, at *4 (N.D. Ind. Nov. 8, 2024) (citing *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013)). We will not conclude that Defendants acted in bad faith without evidence that those responsible for failing to retain the video were on notice of a duty to preserve it. In any event, as detailed above, there is no material dispute regarding the underlying facts captured on the video.

[7] Mr. Upchurch contends that Mr. Richardson told him that he was promoted within one year of having received discipline. Regardless of whether Mr. Richardson's promotion violated IDOC's policy against promotion within one year of discipline or within one year of a poor performance

undisputed that the promotions occurred in Warden Knight's absence, and once she returned from medical leave and learned that Jerry Gilley and Lester Coates had failed to complete the required promotion checklist before promoting Mr. Richardson and Mr. Perry, Warden Knight promptly ensured that Deputy Warden Cole demoted Mr. Richardson and Mr. Perry to the positions they previously held and disciplined both Gilley and Coates for their failure to follow IDOC policies. Based on the prompt corrective action taken by Warden Knight once it was discovered that IDOC policies had not been followed, no reasonable jury could find that Mr. Richardson's and Mr. Perry's August 2022 promotions constitute evidence of IDOC's discriminatory or retaliatory application of its policies. To the contrary, the subsequent demotions and discipline demonstrates IDOC's uniform application of these policies.

Nor is there sufficient evidence from which a reasonable jury could conclude that Mr. Richardson's subsequent promotion in January 2023 failed to comply with IDOC's policies. Warden Knight, who made the promotion decision, testified that Mr. Richardson's 2022 performance was substantially improved from prior years and that, by January 2023, he had been discipline-free for over eighteen months, rendering him eligible for promotion under IDOC's policies. It is true, as Mr. Upchurch argues, that Mr. Richardson's performance review from 2022—as well as his 2020 and 2021 reviews—are missing from his personnel file thereby preventing Warden Knight's testimony regarding Mr. Richardson's 2022 performance from being confirmed by referencing his 2022

---

review, it is undisputed that Mr. Richardson's promotion violated at least one of these policies. Accordingly, we need not delve further into this factual dispute.

28

review.  However, Mr. Upchurch has adduced no evidence apart from the missing performance review to call into question Warden Knight's testimony.  Although Mr. Upchurch argues that the Court should make an adverse inference from the fact of the missing documents, there has been an insufficient showing to support a conclusion that Defendants engaged in the bad faith destruction of evidence.  Accordingly, we cannot find Mr. Richardson's January 2023 promotion to be evidence of a similarly situated White employee being treated more favorably that Mr. Upchurch.

Mr. Upchurch also contends that Defendants failed to investigate his complaints about race discrimination and failed to have an adequate system to investigate and resolve complaints of discrimination.  The evidence shows, however, that after Mr. Upchurch complained to Ms. Roberts and Ms. Taylor-Wilcher regarding his belief that Mr. Richardson's promotion was evidence of the discriminatory nature of his failure to receive promotions based on his disciplinary record, that information was apparently conveyed to Warden Knight, who took prompt action to rescind Mr. Richardson's promotion that had been awarded in violation of IDOC's policies.  Although neither Ms. Roberts nor Ms. Taylor-Wilcher was able to clear Mr. Upchurch's disciplinary record as he requested, there is no evidence that they had such power much less that they had ever done so for any other employee.  Accordingly, IDOC's response to Mr. Upchurch's complaints does not evidence a discriminatory or retaliatory motive.

Regarding the promotions for which he was eligible but did not receive, Mr. Upchurch argues that the evidence establishes that he was far more qualified than the individuals selected for the promotions because of his long tenure and prior experience in

29

supervisory positions.  In failure to promote or failure to hire cases, the Seventh Circuit has held that where, as here, the employer's proffered non-discriminatory reason for its employment decision "is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Mlynczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir. 2006) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002)).

Here, Mr. Upchurch's view that his 30 years of experience renders him eminently more qualified than any other candidate is not sufficient to establish that he was so obviously superior to the candidates selected that there could be "*no dispute* among reasonable persons of impartial judgment that [he] was clearly better qualified." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) (emphasis in original).  As we explained in Mr. Upchurch's first lawsuit, an employee's "own opinions about [his] … qualifications [do not] give rise to a material factual dispute." *Id.* (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996).  While Mr. Upchurch personally believes that his experience is more valuable than the qualifications of the candidates selected above him, an employee's length of tenure alone is not such a markedly superior qualification that no reasonable person could believe other attributes might be more relevant.

For these reasons, we hold that the evidence, when considered as a whole, is not sufficient to support a reasonable jury's finding that Mr. Upchurch's failure to receive the

promotions he sought from January 2022 through April 2024 was due to IDOC's discriminatory or retaliatory animus. IDOC is therefore entitled to summary judgment on Mr. Upchurch's Title VII discrimination and retaliation claims.

### C. Section 1983 Claim Against Defendant Gardner in her Official Capacity

Mr. Upchurch's only remaining claim is his official capacity claim brought pursuant to 42 U.S.C. § 1983 against Warden Gardner under *Ex Parte Young*. In determining that this claim survived Defendants' motion for judgment on the pleadings, we found that, if Mr. Upchurch prevailed on his Title VII claims against IDOC, he potentially would be entitled to some form of prospective relief, such as promotion to the position of captain if he was able to prove that he was denied such a promotion on the basis of unlawful discrimination or retaliation and that Warden Gardner was the named individual with authority to provide such relief. Having now determined that Mr. Upchurch has failed to prove his Title VII claims, he has likewise failed to establish any entitlement to injunctive relief under *Ex Parte Young* and § 1983. Accordingly, Defendant Gardner is entitled to summary judgment on this claim.

### III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [Dkt. 89] is GRANTED. Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: _____3/31/2026_____          _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

31

Distribution:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

James Alex Emerson
COOTS HENKE & WHEELER, P.C.
aemerson@chwlaw.com

Laura Parks
lparks@chwlaw.com